# EXHIBIT 10

# EXHIBIT 10

Case 25-50566-hlb    Doc 8-10    Entered 07/16/25 18:46:16    Page 2 of 17

ELECTRONICALLY FILED
2025 Mar 04 4:12 PM
ANDREA ANDERSEN
COURT ADMINISTRATOR
THIRD JUDICIAL DISTRICT COURT
23-CV-0527: Andrea Andersen, Deputy

Case No.: 23-CV-00527

Dept. No.: I

The undersigned affirms that this document does not contain the social security number of any individual.

**IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF LYON**

STRYK GROUP FUND, a Delaware corporation,

   Plaintiff,

v.

POLYMER80, INC., a Nevada corporation; POLYMER80 PROPERTIES, LLC, a Nevada limited liability company; LORAN KELLEY, JR., an individual; TWANA KELLEY, an individual; and DOES I through X, inclusive,

   Defendants.
_____/

POLYMER80, INC., a Nevada corporation; POLYMER80 PROPERTIES, LLC, a Nevada limited liability company; LORAN KELLEY, JR., an individual; TWANA KELLEY, an Individual,

   Counterclaimants,

v.

STRYK GROUP FUND, a Delaware corporation; STRYK GROUP USA, LLC, a Pennsylvania limited liability Company; JEFFREY EDWARDS, an individual; and CHARLES ATKINSON MYERS, an individual;

   Counterdefendants.
_____/

**SECOND AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIM**

Page 1 of 16

1    Defendants Polymer80, Inc., Polymer80 Properties, LLC, Loran Kelley, Jr., and Twana Kelley (collectively, "Defendants"), by and through their undersigned counsel, Simons Hall Johnston PC, hereby answer the complaint (the "Complaint") of Plaintiff Stryk Group as follows:

1.   Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 1 of the Complaint and therefore deny the same.

2.   Defendants admit the allegations in Paragraph 2 of the Complaint.

3.   Defendants admit the allegations in Paragraph 3 of the Complaint.

4.   Defendants admit the allegations in Paragraph 4 of the Complaint.

5.   Defendants admit the allegations in Paragraph 5 of the Complaint.

6.   Defendants deny the allegations in Paragraph 6 of the Complaint.

7.   In response to Paragraph 7 of the Complaint, Defendants repeat and reallege their responses to Paragraphs 1 through 6 as though fully set forth herein.

8.   In response to Paragraph 8 of the Complaint, Defendants refer to Note #1 for its terms.

9.   In response to Paragraph 9 of the Complaint, Defendants refer to Note #2 for its terms.

10.  Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the last sentence of Paragraph 10 of the Complaint and therefore deny the same. In response to the remaining allegations in Paragraph 10 of the Complaint, Defendants refer to the Security Agreement for its terms.

11.  Defendants deny the allegations set forth in Paragraph 11 of the Complaint.

12.  Defendants deny the allegations set forth in Paragraph 12 of the Complaint.

13.  In response to Paragraph 13 of the Complaint, Defendants repeat and reallege their responses to Paragraphs 1 through 12 as though fully set forth herein.

14.  The allegations set forth in Paragraph 14 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the Security Agreement, Note #1, and Note #2 for their terms.

15.  The allegations set forth in Paragraph 15 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, Defendants refer to the Security Agreement, Note #1, and Note #2 for their terms.

16. Defendants deny the allegations set forth in Paragraph 16 of the Complaint.

17. Defendants deny the allegations set forth in Paragraph 17 of the Complaint.

18. Defendants deny the allegations set forth in Paragraph 18 of the Complaint.

19. Defendants deny the allegations set forth in Paragraph 19 of the Complaint.

20. In response to Paragraph 20 of the Complaint, Defendants repeat and reallege their responses to Paragraphs 1 through 19 as though fully set forth herein.

21. Defendants admit the allegations contained in Paragraph 21 of the Complaint.

22. Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

23. Defendants deny the allegations set forth in Paragraph 23 of the Complaint.

24. Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25. Defendants deny the allegations set forth in Paragraph 25 of the Complaint.

## AFFIRMATIVE DEFENSES

As and for affirmative defenses, Defendants allege the following:

1. The Complaint fails to state a claim upon which relief may be granted.

2. Plaintiff's claims are barred by the doctrine of estoppel.

3. Plaintiff has waived its claims, if any, against Defendants.

4. Plaintiff's claims are barred by the doctrine of acquiescence.

5. Plaintiff's claims are barred based upon a failure of consideration.

6. Plaintiff's claims are barred because Plaintiff fraudulently procured Note #1, Note #2, and the Security Agreement.

7. Plaintiff's claims are barred because Plaintiff fraudulently procured the Equity Purchase Agreement that resulted in the execution of Note #1, Note #2, and the Security Agreement.

8. Plaintiff's claims are barred by Plaintiff's bad faith.

9. Without admitting that Plaintiff has suffered any damages whatsoever, Defendants are entitled to a set-off for damages Defendants suffered as a result of Plaintiff's conduct.

10. Plaintiff's claims are barred by the doctrine of commercial impracticability and/or impossibility.

SIMONS HALL JOHNSTON PC
22 State Route 208
Yerington, Nevada 89447
Phone: (775) 463-9500

11. Defendants are entitled to rescission of the Equity Purchase Agreement, Note #1, Note #2, and the Security Agreement

12. Pursuant to Rule 11 of the Nevada Rules of Civil Procedure, Defendants reserve the right to amend this answer to assert additional affirmative defenses should the facts so warrant.

WHEREFORE, and based upon the foregoing, Defendants respectfully request and pray for relief as follows with respect to Plaintiffs' Complaint:

1. That Plaintiffs take nothing by virtue of this action, and that the Complaint be dismissed with prejudice;
2. For costs of suit and attorney's fees to the extent allowed by law; and
3. For such other and further relief as the Court deems proper and just.

## COUNTERCLAIM

Counterclaimants Polymer80, Inc., Polymer80 Properties, LLC, Loran Kelley, Jr., and Twana Kelley (collectively, "Counterclaimants"), by and through their undersigned counsel, Simons Hall Johnston PC, hereby allege the following as and for their counterclaims against Counterdefendants Stryk Group Fund ("SGF"), Stryk Group USA, LLC ("Stryk USA"), Jeffrey Edward ("Edwards"), and Charles "Chase" Myers ("Myers") (collectively, "Counterdefendants"):

### JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to Nevada Constitution Article 6, Section 6 because Counterclaimants have suffered damages in excess of $15,000.00, and their claims are accordingly excluded from the original jurisdiction of the justice courts.

2. Venue is proper in this Court because the events giving rise to the claims herein occurred in Lyon County, Nevada.

3. Each of Counterclaimants' claims against the Counterdefendants and the joinder thereof are properly before this Court pursuant to Rules 13, 19, and 20 of the Nevada Rules of Civil Procedure.

### PARTIES

4. Counterclaimant Polymer80, Inc. ("Polymer80") is a Nevada corporation previously doing business in the State of Nevada with headquarters located in Dayton, Lyon County, Nevada.

5. Counterclaimant Polymer80 Properties, LLC ("P80P") is a Nevada limited liability company that owned real property located in Dayton, Lyon County, Nevada.

6. Counterclaimants Loran Kelley and Twana Kelley are owners of Polymer80.

7. Counterclaimant Loran Kelley is also one of the founders of Polymer80.

8. Polymer80 was a leading manufacturer of innovative gun-related products, components, and aftermarket accessories.

9. Counterdefendant SGF is, upon information and belief, a Delaware corporation.

10. Counterdefendant Stryk USA is, upon information and belief, a Pennsylvania limited liability company.

11. Counterdefendant Edwards is an individual who, upon information and belief, resides in Bozeman, Montana. Upon information and belief, Edwards is the managing partner of SGF and an owner and manager of Stryk USA. Upon information and belief, Edwards has ownership interests in both SGF and Stryk USA. Counterdefendant Edwards was separately the Chairman of Polymer80's board of directors, starting in October 2021. Additionally, Counterdefendant Edwards was a "responsible person" for Polym80 for federal firearms licensing purposes.

12. Counterdefendant Myers is an individual who, upon information and belief, resides in Bozeman, Montana. Upon information and belief, Myers is the corporate secretary of SGF and accordingly an officer of that company. Myers, upon information and belief, also has a minority ownership interest in Stryk USA. Counterdefendant Myers was separately, at relevant times, a director, corporate secretary, and Chief Legal Officer of Polymer80, starting in October 2021. Additionally, Counterdefendant Myers was a "responsible person" for Polym80 for federal firearms licensing purposes.

13. At all times relevant herein, Counterdefendants, and each of them, were the agents, representatives, alter egos, or employees of each of the remaining Counterdefendants and/or acting in concert with one another, and were at all times acting within the course and scope of said agency, representation, or employment, and each Counterdefendant has authorized, ratified, and approved the actions of the others. Therefore, each Counterdefendant is liable for the acts of each of the remaining Counterdefendants.

# GENERAL ALLEGATIONS

14. In or around the first part of 2021, Polymer80 engaged Stryk USA as a marketing, sales, and vendor consultant in connection with Polymer80's business.

15. Edwards was the principal individual for Stryk USA with respect to the consulting services that Stryk USA agreed to provide and did provide to Polymer80. Myers also had, upon information and belief, an ownership interest in Stryk USA.

16. Polymer80 paid Stryk USA consulting fees for the consulting services Stryk USA provided to Polymer80; however, unbeknownst to Polymer80, Stryk USA was also collecting commissions from third parties for whom Stryk USA was providing consulting services to Polymer80. The commissions financially benefitted Edwards and Myers individually.

17. Specifically, Stryk USA would take a commission on payments Polymer80 paid to third parties. These third parties included, upon information and belief, Three Sigma Manufacturing and Tactical Kinetics. Counterclaimants allege, on information and belief, that but for these commissions paid to Stryk Group, Polymer80 would have obtained more favorable terms for their business dealings with those third parties.

18. Accordingly, Stryk USA, for Edwards' and Myers' personal financial benefit, was receiving kickbacks as a result of Stryk USA's consulting relationship with Polymer80, and these kickbacks were detrimental and undisclosed to Polymer80.

19. The kickbacks were also hidden from and not disclosed to Counterclaimants.

20. On or about September 21, 2021, SGF became a part owner of Polymer80 and P80P. Specifically, SGF acquired 4,500 shares of stock in Polymer80 from David Borges, representing a forty-five percent interest in Polymer80, and a fifty-percent membership interest in P80P.

21. SGF became an owner of Polymer80 by fraudulently inducing Counterclaimants to part ways with David Borges, who was an owner of Polymer80 and its Chief Executive Officer at that time in 2021. In this regard, Edwards falsely accused David Borges of self-dealing and malfeasance to interject himself, SGF, and Myers into Polymer80's ownership and management. The intent of Myers and Edwards was to ultimately take control of Polymer80 or at least to continue to profit improperly from Polymer80's existing relationship with Stryk USA.

22. SGF acquired its ownership interest in Polymer80 pursuant to an Equity Purchase Agreement between Borges and SGF (the "Borges Equity Purchase Agreement"), pursuant to which SGF purchased Borges' stock in Polymer80 for $4,000,000.00, to be paid in 120 monthly installments. The purchase price for Borges' stock was not evidenced by a promissory note and was not secured, although Edwards personally guaranteed the payment.

23. The Borges Equity Purchase Agreement was drafted to favor SGF as the buyer because there was no due on sale clause if SGF sold the stock it purchased from Borges, no promissory note evidenced SGF's payment obligations, SGF did not pledge the stock it purchased as security, and SGF did not otherwise provide any security or collateral for its payment obligations.

24. Upon information and belief, Myers caused the Borges Equity Purchase Agreement to be drafted in SGF's favor, utilizing a law firm in which a family member of his worked.

25. When SGF and Borges executed the Borges Equity Purchase Agreement, Borges also entered into a Separation Agreement and Waiver and Release of All Claims (the "Separation Agreement"), which stated Polymer80 would pay Borges a total of $4,000,000.00 over the course of ten years by way of 120 equal monthly installments. Jeff Edwards guaranteed the payments due to Borges under the Separation Agreement.

26. After SGF became an owner of Polymer80, Edwards was named Polymer80's Chief Marketing Officer and Edwards was given a seat on Polymer80's board of directors. He was, indeed, the Chairman of Polymer80's board.

27. Edwards received separate compensation from Polymer80 for his service on the company's board of directors.

28. Myers, despite not being a lawyer, became Polymer80's Chief Legal Officer and corporate secretary. Myers was accordingly an officer of Polymer80. He was also a member of Polymer80's board, and Myers was compensated for his board position separate and apart from the compensation he received as Polymer80's Chief Legal Officer.

29. Both Myers and Edwards also became a "Responsible Person" for Polymer80 for purposes of federal firearms laws.

30. As a result of their titles, positions, and roles at Polymer80, both Myers and Edwards owed fiduciary duties to Polymer80 and its shareholders.

31. When SGF became an owner of Polymer80 and Edwards and Myers assumed their respective fiduciary roles at Polymer80, Counterclaimants had no knowledge of the commissions/kickbacks that were being paid to Stryk USA for the personal benefit of Edwards and Myers and to the detriment of Polymer80. Additionally, Edwards and Myers did not disclose their kickback scheme.

32. After SGF became an owner of Polymer80 and after Edwards and Myers assumed their fiduciary roles at Polymer80, Stryk USA continued to collect commissions from third parties who did business with Polymer80.

33. Specifically, for all monies Polymer80 paid to certain third parties for goods and/or services, including Three Sigma Manufacturing and Tactical Kinetics, Stryk USA would receive a six percent commission on Polymer80's payments to the third parties.

34. These commissions, upon information and belief, were paid to Stryk USA for the personal benefit of Edwards and Myers (the majority and minority owners, respectively, of Stryk USA).

35. Neither SGF nor Edwards nor Myers disclosed these commission arrangements to Polymer80 or any of the other Counterclaimants. Counterclaimants only became aware of the commission payments after this lawsuit was filed.

36. The commission payments were detrimental to Polymer80 because, by definition and on information and belief, they increased Polymer80's costs to the third parties that paid the commissions to Stryk USA for Edwards' and Myers' benefit.

37. Also unbeknownst to Counterclaimants in 2022 was the fact that Stryk USA was pocketing monies that were supposed to be paid to third parties, such as Jones & Co. In particular, Jones & Co. was to be paid for certain products it sold and services it provided plus a commission. Stryk USA was to facilitate the payments from Polymer80 to Jones & Co. However, Stryk USA pocketed the commissions owed to Jones & Co., resulting in Polymer80 being indebted to Jones & Co. in the amount of the commissions Stryk USA misappropriated for Edwards' and Myers' personal

benefit. Neither Myers nor Edwards ever disclosed the misappropriation of these funds.

38. Polymer80 alleges on information and belief that the Jones & Co. payments Stryk USA misappropriated and pocketed were misappropriated for Edwards' and Myers' personal benefit rather than being paid to Jones & Co.

39. In or around September 2022, Loran Kelley confronted Edwards with respect to his performance at Polymer80, although Loran Kelley was unaware at that time of Counterdefendants' ongoing scheme to obtain kickbacks and misappropriate funds owed to others.

40. Tellingly, Edwards did not disclose at that time his self-dealing or the commissions that he was obtaining through Stryk USA. Edwards also failed to disclose the misappropriation of commissions owed to Jones & Co.

41. Myers similarly did not disclose his self-dealing that was occurring through Stryk USA.

42. Efforts were accordingly undertaken to have Edwards part ways with Polymer80; however, Myers aligned himself with Edwards in the process, while remaining in a fiduciary role at Polymer80.

43. In mid to late September 2022, Edwards said he would loan $2,000,000 to Polymer80 as a "Make Right" for his deficient performance without disclosing his malfeasance.

44. Edwards stated that he would sell his stake in a Colorado cattle ranch to make the $2 million loan to Polymer80.

45. Edwards repeatedly assured Polymer80 and Loran Kelley that he would make a $2 million loan to Polymer80, and prior to October 3, 2022, Edwards represented to Loran Kelly, Mike Bush, Daniel McCalmon, and Chase Myers that the $2 million loan would be made.

46. Edwards had no intention of ever making a loan of $2 million to Polymer80; consequently, his representations were false. Upon information and belief, Myers also knew that Edwards had no intention of ever making a loan of $2 million to Polymer80 but never disclosed this fact to Counterclaimants, despite being Polymer80's Chief Legal Officer and a member of its board.

47. At this point in time in 2022, SGF's continued ownership in Polymer80 and P80P and Edwards' role as a director and the Chief Marketing Officer of Polymer80 became untenable.

Page 9 of 16

48. As a result, Polymer80 and SGF entered into an Equity Purchase Agreement (the "EPA") effective as of October 3, 2022, pursuant to which Polymer80 agreed to buy and SGF agreed to sell SGF's ownership interests in Polymer80 and P80P.

49. Notwithstanding the fact that Myers was Polymer80's Chief Legal Officer and a member of its board, Myers worked on behalf of SGF in drafting the EPA and was the liaison between SGF and its attorneys in drafting the EPA.

50. The EPA, in contrast to the Borges Equity Purchase Agreement, is pro-seller rather than pro-buyer. Accordingly, Myers, having a direct conflict of interest, had the EPA drafted in favor of SGF, and consequently himself and Edwards, to the detriment of Counterclaimants.

51. Upon information and belief, Myers caused the EPA to be drafted in SGF's favor, utilizing a law firm in which a family member of his worked.

52. The EPA resulted in the Counterclaimants executing promissory notes and a security agreement in favor of SGF.

53. Polymer80 entered into the EPA, and Loran Kelly and Twana Kelley signed it under the heading "Limited Appearances", based on Edwards' false and fraudulent representation that he would loan Polymer80 $2 million once the EPA was signed.

54. Counterclaimants executed the promissory notes and security agreement resulting from the EPA based on Edwards' representation that he would loan Polymer80 $2 million once the EPA was signed.

55. Edwards insisted that no references to the $2 million loan he promised to make would be included in the EPA because he wanted the two deals (i.e., the EPA and the $2 million loan) to be separate and distinct. However, Edwards made these demands because he never intended to make the $2 million loan he promised Counterclaimants. Instead, he represented that the $2 million loan would be made to Polymer80 to induce the Counterclaimants to enter into the EPA and related documents. But for Edwards' promise to make a $2 million loan to Polymer80, the Counterclaimants would not have entered into the EPA or executed the promissory notes and security agreement that resulted from the EPA.

56. Because Myers worked on the EPA for the benefit of SGF and Edwards,

Page 10 of 16

1 notwithstanding his fiduciary duties to Polymer80, the EPA was completed in the best interests of
2 SGF, Edwards, and Myers, not in the best interests of Polymer80.

3     57.     Polymer80 entered into the EPA without knowledge of Myers' direct conflict of
4 interest and without knowledge of Myers' efforts to secure a deal favorable to SGF, Edwards, and
5 himself to the detriment of Counterclaimants.

6     58.     Myers misused his position on Polymer80's board and as Polymer80's Chief Legal
7 Officer to construct the EPA in manner that benefitted himself, Edwards, and SGF to the detriment
8 of Counterclaimants.

9     59.     When the EPA was signed, Counterclaimants had no knowledge of the
10 Counterdefendants' self-dealing, Edwards' abuse of his position at Polymer80, and/or Myers' abuse
11 of his positions at Polymer80.  Had Counterclaimants known of the self-dealing, conflicts of interest,
12 and misappropriation of funds, they would not have entered into the EPA nor would they have
13 executed the promissory notes and security agreement that resulted from the EPA.  Edwards and
14 Myers did not disclose their self-dealing and misappropriation of funds because they wanted to
15 secure the EPA and related notes and security agreement.  Myers did not disclose his conflicts of
16 interests because he wanted to secure the EPA and related promissory notes for the benefit of SGF
17 and his business partner Edwards.  All of this was contrary to Edwards' and Myers' disclosure
18 obligations and fiduciary obligations to Polymer80.

### FIRST CLAIM FOR RELIEF

**(Fraud in the Inducement Against SFG, Edwards, and Myers)**

21     60.     Counterclaimants repeat and reallege each and every allegation above as if fully set
22 forth herein.

23     61.     Effective October 3, 2022, Polymer80 and SGF entered into the EPA.

24     62.     To induce the execution of the EPA, Edwards falsely misrepresented to
25 Counterclaimants that he would loan Polymer80 $2 million following the execution of the EPA.

26     63.     At the time of this misrepresentation, Edwards knew that he would not make any loan
27 to Polymer80 and, therefore, the representation was knowingly false when it was made.

28     64.     In fact, Edwards falsely told Counterclaimants that he did not want his promised loan

Page 11 of 16

of $2 million referenced in the EPA because Edwards had no intention of making the loan.

65.   Edwards intended to induce Counterclaimants to act in reliance of his misrepresentations so Counterclaimants would consent to and execute the EPA.

66.   Edwards intended to induce Counterclaimants to act in reliance of his misrepresentations and execute the EPA, so Edwards, after failing to make the $2 million loan he promised, could attempt to take over Polymer80 and P80P in the event of a default on Counterclaimants' part under the promissory notes and security agreement that were executed as a result of the EPA.

67.   Counterclaimants justifiably relied on Edwards' misrepresentation in entering in the EPA and related documents, all to their detriment.

68.   Edwards, as a director and the Chief Marketing Officer of Polymer80, had a duty to disclose his self-dealing with third parties, such as Three Sigma Manufacturing, and the commissions that such third parties were paying to Stryk USA for Edwards' benefit. Edwards did not disclose his self-dealing to Counterclaimants.

69.   Edwards also had a duty to disclose the fact that monies owed to Jones & Co. were being diverted and misappropriated to Polymer80's detriment.

70.   Had Edwards disclosed his self-dealing and misappropriation of funds, Counterclaimants would not have entered into the EPA and related documents.

71.   Myers, as a director, corporate secretary, and Chief Legal Officer of Polymer80, had a duty to disclose his self-dealing with third parties and the commissions that such third parties were paying to Stryk USA for Myers' benefit. Myers did not disclose his self-dealing to Counterclaimants.

72.   Myers also had a duty to disclose the fact that he was working for SGF, not Polymer80, in having the EPA drafted on terms favorable to SGF and detrimental Counterclaimants. Myers did not disclose his conflict of interest and continued self-dealing.

73.   Myers had a duty to disclose the fact that he knew Edwards had no intention of making a $2 million loan to Polymer80.

74.   Had Myers disclosed his self-dealing, his alignment with Edwards, and his conflict

of interest, Counterclaimants would not have entered into the EPA and related documents.

75. As a direct, proximate, and foreseeable result of Counterdefendants' acts and omissions, the EPA and related documents were procured by fraud and Counterclaimants have been damaged in excess of Fifteen Thousand Dollars ($15,000) in an amount to be determined at trial and/or are entitled to rescind the EPA and related documents, including the promissory notes and security agreement.

76. Counterdefendants' acts and omissions were committed with fraud, oppression, and/or malice, entitling Counterclaimants to an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against Edwards and Myers)

77. Counterclaimants repeat and reallege each and every allegation above as if fully set forth herein.

78. As a director and the Chief Marketing Officer of Polymer80, Edwards had a fiduciary duty to act in the best interests of Polymer80 and refrain from engaging in undisclosed self-dealing and fraud.

79. Edwards breached the fiduciary duty he owed to Polymer80 by receiving, through Stryk USA, commissions on payments Polymer80 paid to third parties, including Three Sigma Manufacturing and Tactical Kinetics. Edwards breached the fiduciary duty he owed to Polymer80 by causing monies owed to Jones & Co. to be misappropriated for his benefit and to the detriment of Polymer80.

80. As a director, corporate secretary, and Chief Legal Officer of Polymer80, Myers had a fiduciary duty to act in the best interests of Polymer80, refrain from conflicts of interest, and refrain from engaging in undisclosed self-dealing.

81. Myers breached the fiduciary duty he owed to Polymer80 by receiving, through Stryk USA, commissions on payments Polymer80 paid to third parties and drafting the EPA for SGF's benefit, rather than on terms fair and reasonable to Polymer80 and the other Counterclaimants.

82. As a direct, proximate, and foreseeable result of Edwards' and Myers' breach of their

1  fiduciary duties, Counterclaimants have been damaged in excess of Fifteen Thousand Dollars
2  ($15,000) in an amount to be determined at trial.

3  83. Edwards' and Myers' acts and omissions were committed with fraud, oppression,
4  and/or malice, entitling Polymer80 to an award of punitive damages in an amount to be determined
5  at trial.

**THIRD CLAIM FOR RELIEF**

**(Aiding and Abetting Breach of Fiduciary Duty Against SGF and Stryk USA)**

84. Counterclaimants repeat and reallege each and every allegation above as if fully set forth herein.

85. Edwards and Myers owed and breached the fiduciary duties they owed to Polymer80 as alleged above.

86. SGF and Stryk USA knowingly and substantially participated in and encouraged Edwards' breach of fiduciary duty.

87. SGF knowingly and substantially participated in and encouraged Edwards' and Myers' breach of fiduciary duties because it was an owner of Polymer80, was aware of Edwards' and Myers' self-dealing, and did not disclose it to Polymer80.

88. Stryk USA knowingly and substantially participated in and encouraged Edwards' and Myers' breach of fiduciary duties because, upon information and belief, it received the commission payments that third parties paid as a result of their business dealings with Polymer80, and these payments were received by Stryk USA for Edwards' and Myers' personal benefit. Stryk USA was also the recipient, upon information and belief, of misappropriated funds and received such funds for Edwards' and Myers' benefit.

89. SGF and Stryk USA accordingly aided and abetted Edwards' and Myers' breach of fiduciary duties.

90. As a direct, proximate, and foreseeable result of SGF's and Stryk USA's aiding and abetting of Edwards' and Myers' breach of fiduciary duties, Counterclaimants have been damaged in excess of Fifteen Thousand Dollars ($15,000) in an amount to be determined at trial.

91. SGF's and Stryk USA's acts and omissions were committed with fraud, oppression,

and/or malice, entitling Polymer80 to an award of punitive damages in an amount to be determined at trial.

**WHEREFORE**, Counterclaimants pray for judgment against Counterdefendants as follows:

1. For compensatory damages in an amount to be determined at trial but in no event in an amount less than fifteen thousand dollars ($15,000.00);
2. For rescission of the EPA and related documents, including the promissory notes resulting from the EPA;
2. For an award of punitive damages in an amount to be determined at trial;
3. For an award of reasonable attorney's fees and costs; and
4. For such other and further relief as the Court may deem just and proper.

DATED this 4th day of March, 2025.

/s/ Brad M. Johnston
Brad M. Johnston
Nevada Bar No. 8515
SIMONS HALL JOHNSTON PC
22 State Route 208
Yerington, Nevada 89447
Telephone: 775.463.9500
Facsimile: 775.463.4032
bjohnston@shjnevada.com
*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I, Brad M. Johnston, hereby certify that on this date I electronically filed the foregoing document with the Court's e-file system which will e-serve and send notice to the following:

    Seth J. Adams, Esq.
    Woodburn and Wedge
    6100 Neil Road, Suite 500
    Reno, NV 89511
    sadams@woodburnandwedge.com

DATED this 4th day of March, 2025.

                                      */s/ Brad M. Johnston*
                                      Brad M. Johnston

SIMONS HALL JOHNSTON PC
22 State Route 208
Yerington, Nevada 89447
Phone: (775) 463-9500